**ZIMMERMAN REED LLP**
Caleb Marker (SBN 269721)
caleb.marker@zimmreed.com
Nare Kupelian (SBN 337700)
nare.kupelian@zimmreed.com
6420 Wilshire Blvd., Ste. 1080
Los Angeles, CA 90048
(877) 500-8780 Telephone
(877) 500-8781 Facsimile

Molly Billion (SBN 368034)
molly.billion@zimmreed.com
80 S 8th Street, 1100 IDS Center
Minneapolis, MN 55402
Telephone (612) 341-0400

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| VANESSA REYES and JULIO POMBAL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LINEAGE, INC.; LINEAGE LOGISTICS LLC; LINEAGE LOGISTICS HOLDINGS LLC; BAY GROVE CAPITAL LLC; CHILL BUILD LLC; LOS PALOS STREET OPERATING, LLC; ALTUS POWER, INC.; PEARCE SERVICES LLC; and DOES 1-50, inclusive,<br><br>Defendants. | Case No.: 2:26-cv-08228 CV (SKx)<br><br>*Assigned to the Honorable Cynthia Valenzuela; Magistrate Steve Kim*<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>1. Negligence<br>2. Premises Liability<br>3. Private Nuisance, Cal. Civil Code § 3479<br>4. Public Nuisance, Cal. Civil Code § 3480<br>5. Trespass<br>6. Strict Liability–Extrahazardous and/or Ultrahazardous Activity<br>7. Unlawful Business Practice, Cal. Bus. & Prof. Code § 17200 *et seq.*<br><br>JURY TRIAL DEMANDED |

Plaintiffs Vanessa Reyes and Julio Pombal, individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendants Lineage, Inc.; Lineage Logistics LLC; Lineage Logistics Holdings LLC; Bay Grove Capital LLC; Chill Build Los Angeles I, LLC; Los Palos Street Operating, LLC; Altus Power, Inc.; Pearce Services LLC; and Does 1-50 (collectively, "Defendants"), arising from the industrial fire that ignited on the roof of an approximately 500,000-square-foot cold-storage warehouse located on the 1400 block of South Los Palos Street in the Boyle Heights neighborhood of Los Angeles, California (the "Facility"). Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## I. INTRODUCTION

1. On or about June 17, 2026, approximately 70 California residents were ordered to evacuate the area immediately surrounding the Facility and more than 4,000 additional residents were subjected to shelter-in-place orders after flames reached a refrigerant line at the Facility carrying anhydrous ammonia, causing several small explosions and sending a thick black plume of toxic smoke into the air. Residents who did not heed these orders would breathe in hazardous smoke that prompted the South Coast Air Quality Management District ("SCAQMD") to issue a Particle Pollution Advisory and Smoke Advisory.

2. Plaintiffs Vanessa Reyes and Julio Pombal, impacted residents of Los Angeles County, now bring the instant class action on behalf of themselves and others similarly situated to hold Defendants liable for negligence, premises liability, private and public nuisance, strict liability for the handling of extra hazardous materials, trespass, and violations of the Unfair Competition Law ("UCL"). Plaintiffs, on behalf of themselves and all other Class members, bring the below common law tort claims and state statutory claims seeking declaratory and injunctive relief, monetary damages including punitive damages, equitable relief, and all other relief authorized by law.

## II. PARTIES

### A. Plaintiffs

3. Plaintiff **Vanessa Reyes** is a resident of Los Angeles County, California, and a citizen of the State of California. At all relevant times, Plaintiff Reyes resided in a home located in Los Angeles County, approximately three and a half miles from the Facility.

4. Plaintiff **Julio Pombal** is a resident of Los Angeles County, California, and a citizen of the State of California. At all relevant times, Plaintiff Pombal resided in a home located in Los Angeles County, approximately one mile from the Facility.

### B. Defendants

5. Defendant **Lineage, Inc.** is a Maryland corporation with its principal place of business at 46500 Humboldt Drive, Novi, Michigan.

6. Defendant **Lineage Logistics LLC** is a Delaware limited liability company with its principal place of business at 46500 Humboldt Drive, Novi, Michigan.

7. Defendant **Lineage Logistics Holdings LLC** is a Delaware limited liability company with its principal place of business at 46500 Humboldt Drive, Novi, Michigan.

8. Defendant **Bay Grove Capital LLC** is a Delaware limited liability company, with its principal place of business at 801 Montgomery Street, Fifth Floor, San Francisco, California.

9. Plaintiffs are informed and believes and, based upon such information and belief, alleges that at all times relevant, Defendants Lineage, Inc.; Lineage Logistics, LLC; Lineage Logistics Holdings LLC; and Bay Grove Capital LLC (collectively, "Lineage"), inclusive, and each of them operated, controlled, managed, and/or maintained cold-storage operations at the Facility as a tenant, including the storage and handling of food products, and was responsible for the operation, maintenance, safety, and emergency response systems of the Facility, including its anhydrous ammonia refrigeration system and lithium-ion battery-powered forklift fleet.

10. Defendant **Chill Build Los Angeles I, LLC** ("Chill Build") is a Delaware limited liability company, with its principal place of business at 6831 East 32nd Street, Suite 300, Indianapolis, Indiana.

11. Plaintiffs are informed and believe and, based upon such information and belief, allege that at all times relevant, Defendant Chill Build owned the real property and building structure constituting the Facility. As the property owner and landlord, Defendant Chill Build owed a non-delegable duty to maintain the Facility in a reasonably safe condition. Defendant Chill Build was responsible for authorizing and permitting the installation of the rooftop solar array at the Facility (the "Solar Array").

12. Defendant **Los Palos Street Operating, LLC** ("Los Palos") is a Delaware limited liability company, with its principal place of business at 2200 Atlantic Street, Suite 600, Stamford, Connecticut.

13. Plaintiffs are informed and believe and, based upon such information and belief, alleges that at all times relevant, Defendant Los Palos owned the Solar Array and leased the roof of the Facility for the operation and maintenance of the Solar Array.

14. Defendant **Altus Power, Inc.** ("Altus Power") is a Delaware corporation, with its principal place of business at 2200 Atlantic Street, Suite 600, Stamford, Connecticut.

15. Plaintiffs are informed and believe and, based upon such information and belief, allege that at all times relevant, Defendant Altus Power was and is a direct or indirect parent of and exercised ownership and control over Defendant Los Palos and the Solar Array at the Facility.

16. Defendant **Pearce Services, LLC** ("Pearce Services") is a Delaware limited liability company, with its principal place of business at 1222 Vine Street, Paso Robles, California.

17. Plaintiffs are informed and believe and, based upon such information and belief, allege that at all times relevant, Defendant Pearce Services was the contractor retained by Altus Power and/or Los Palos to perform testing and maintenance work on the Solar Array. On June 17, 2026, employees and/or agents of Pearce Services were present on the roof of the Facility when the fire giving rise to this action ignited.[1]

18. The true names and capacities, whether individual, plural, corporate, partnership,

---

[1] *See* Robin Urevich & Aaron Cantu, *As Cold Storage Company Became Global Titan, Boyle Heights Fire Risks Piled Up*, LAist, https://laist.com/news/climate-environment/lineage-cold-storage-company-warehouse-boyle-heights-fire-risks (July 1, 2026).

associate, or otherwise, of **Defendants Does 1–50**, inclusive, are unknown to Plaintiffs who therefore sue said Defendants by such fictitious names. Defendants Does 1–50, inclusive, are each directly or vicariously responsible for the harms alleged in this Complaint. Plaintiffs thus sue Defendants Does 1–50 pseudonymously under California Code of Civil Procedure section 474. If and when Plaintiffs learn the Defendants' true names, capacities, and ways in which they caused harm, Plaintiffs will seek leave to amend this Complaint.

## III. JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act ("CAFA"). 28 U.S.C. § 1332(d). CAFA jurisdiction is appropriate because there is diversity in citizenship between the parties, there are 100 or more Class Members, and the aggregate amount in controversy exceeds $5,000, exclusive of interest and costs.

20. This Court has personal jurisdiction over Defendants because each took actions in this District that gave rise to the fire that ignited on the roof of the Facility, the resultant release of hazardous smoke, and, thus, to Plaintiffs' and the Class's claims. Each Defendant has conducted significant business in, has sufficient minimum contacts with, and has otherwise purposefully availed themselves of the markets of this District so as to render the exercise of jurisdiction over Defendants by this Court consistent with the traditional notions of fair play and substantial justice.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the challenged conduct occurred in, was directed to, and emanated from this District.

## IV. FACTUAL ALLEGATIONS

### A. The Facility and Rooftop Solar Array

22. Lineage boasts "a robust, global network of temperature-controlled facilities,"[2] and operated the Facility in the Boyle Heights neighborhood of Los Angeles, California as a cold-storage warehouse, storing mass quantities of food products at low temperatures.

23. To maintain these low temperatures, Lineage uses, handles, and stores explosive, flammable, and hazardous substances including, but not limited to, anhydrous ammonia at the Facility.

24. A solar array was installed on the roof of the Facility. The Solar Array was owned by Defendant Los Palos, a subsidiary of Defendant Altus, and the roof of the Facility was lease to the Solar Array's owner for its operation and maintenance.

25. A previous solar panel fire broke out on the roof of the Facility in August 2024.[3]

26. The Facility is located in a densely populated area of Los Angeles, known as Boyle Heights. The Facility is surrounded by homes, apartments, schools, businesses, and community spaces, making the consequences of a catastrophic incident foreseeably devastating.

### B. Anhydrous Ammonia

27. Anhydrous ammonia is a widely used refrigerant in industrial facilities, including the Facility.

28. Anhydrous ammonia is also flammable and explosive when exposed to fire.[4] It is corrosive to the skin, eyes, and lungs. At high levels of concentration, anhydrous ammonia can be fatal.[5]

29. Anhydrous ammonia is a "regulated substance" under the Clean Air Act (42 U.S.C. §§ 7412(r)(2)(B), (r)(3); 40 C.F.R. § 68.130); a "hazardous substance" under the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9602; 40 C.F.R. § 302.4); and

---

[2] *See Global Warehousing: Warehouse Storage Built for Your Supply Chain*, Lineage, https://www.onelineage.com/services/global-warehousing (last visited July 2, 2026).

[3] Margaret Stewart, *Firefighters Save Building from Solar Panel Blaze in Boyle Heights*, L.A. Fire Dep't (Aug. 14, 2024), https://lafd.org/news/firefighters-save-building-solar-panel-blaze-boyle-heights

[4] *Ammonia Refrigeration: Emergency Response*, OSHA, https://www.osha.gov/etools/ammonia-refrigeration/emergency-response (last visited July 2, 2026).

[5] *See, e.g.*, Clara Harter, *Crews Gain Control of Boyle Heights Warehouse Fire; 'Highly Toxic' Ammonia Leak Spurs Concern*, L.A. Times (June 17, 2026), https://www.latimes.com/california/story/2026-06-17/massive-boyle-heights-warehouse-fire-prompts-shelter-in-place-orders.

an "extremely hazardous substance" under the Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11002; 40 C.F.R. Part 355, App'x A & B).

30. Lineage has previously been accused of failing to comply with safety regulations related to accidental release of anhydrous ammonia. In 2023, Lineage agreed to pay a fine to the Environmental Protection Agency over how another one of its facilities managed chemical risk posed by the anhydrous ammonia stored onsite.[6]

**C. The Fire at the Facility**

31. At approximately 2:30 p.m. on June 17, 2026, a fire broke out on the roof of the Facility. The fire spread into a massive blaze that the Los Angeles Fire Department ("LAFD") described as a "very complex" fire with numerous hazards for firefighters.[7]

32. LAFD Chief Jaime Moore reported that the fire was a surface fire on the solar panels located on the Facility's roof. An LAFD spokesperson also reported that the blaze compromised a pressurized ammonia line within the Facility.[8] The compromised ammonia line caused ammonia to leak into the air, and fire officials also reported a reading of hydrogen fluoride, which indicated that a lithium ion battery had caught fire as well, likely from a battery-operated forklift.[9]

33. The massive fire continued to burn through dense insulation foam and other industrial materials, sending an enormous cloud of black smoke into the sky above Los Angeles.

---

[6] *Id.*

[7] *Massive Cleanup Begins After Boyle Heights Warehouse Fire Officially Knocked Down*, ABC7 (June 28, 2026), https://abc7.com/live-updates/massive-fire-burning-boyle-heights-east-los-angeles-shelter-place-ordered-area/19318518/entry/19340193.

[8] Jonathan Lloyd & Danielle Smith, *Hourslong Shelter-In-Place Order Lifted for Boyle Heights Warehouse Fire*, NBC L.A. (June 18, 2026), https://www.nbclosangeles.com/news/local/boyle-heights-fire-lineage/3905682.

[9] Jocelyn Fiset, *Shelter-In-Place Reinstated As Crews Vent Hazardous Smoke from Boyle Heights Storage Facility*, KTLA5 (June 18, 2026), https://ktla.com/news/local-news/boyle-heights-fire-smoke-shelter-in-place-order.



*Figure 1: Cloud of Black Smoke over Los Angeles*

34. Firefighters were called off the roof due to structural concerns, and firefighters were unable to enter the Facility due to industrial hazards.[10] More than 130 LAFD firefighters were assigned to the incident.[11]

35. The fire required the use of water-dropping helicopters, typically used for wildfires, to extinguish and continued to burn for a week.[12]

**D. Evacuation and Shelter-in-Place Orders**

36. In light of the hazards presented by the fire, ensuing ammonia leak, and fumes, LAFD ordered about 70 people to evacuate. Local authorities ordered those in the surrounding area to shelter in place shortly after the fire broke out. The order was lifted at approximately 8:45 p.m. on June 17, 2026, but was reinstated on June 18, 2026 as the LAFD undertook measures to ventilate hazardous smoke from the Facility.

---

[10] Associated Press, *What to Know About a Cold Storage Warehouse Fire in Los Angeles*, NPR (June 23, 2026), https://www.npr.org/2026/06/23/g-s1-129578/la-warehouse-fire.
[11] Lloyd & Smith, *supra* note 8.
[12] *Id.*

37. This shelter-in-place order was lifted once again at approximately 11:30 p.m. on Friday, June 19, 2026, but a smoke advisory issued by SCAQMD remained in effect until at least June 22.[13]

38. On June 19, 2026, a temporary air quality monitoring station measured an extremely hazardous 755 micrograms per cubic meter of fine particles for more than an hour, according to SCAQMD.[14] For comparison, an air monitor in Pasadena recorded about 650 micrograms per cubic meter during the Eaton fire in 2025.[15]

39. Over multiple days, SCAQMD air monitoring showed fine particulate matter levels reaching "Unhealthy for Sensitive Groups" to "Very Unhealthy" air quality warnings. There is no completely safe level of fine particulate pollution, and higher concentrations are worse.

40. Upon information and belief, thousands of individuals in the Los Angeles area inhaled the smoke and polluted air emanating from the fire at the Facility.

41. While the fire continued to burn, more than three times as many people went to emergency departments within 10 miles of the Facility mentioning the fire or smoke inhalation compared with the two weeks prior, according to data from the Los Angeles County Department of Public Health.[16] The Department of Public Health also reported nearly double the number of patients mentioning throat pain within five miles of the fire.[17]

42. According to public health experts, there may be delayed pulmonary effects from the hazardous smoke. These health effects may not appear in emergency room data but will likely show up

---

[13] Dean Fioresi, Julie Sharp, Matthew Rodriguez & Chelsea Hylton, *Boyle Heights Shleter-In-Place Order Lifted as LA Firefighters Ventilate Cold Storage Facility*, CBS News (June 19, 2026), https://www.cbsnews.com/losangeles/news/boyle-heights-lineage-cold-storage-fire-solar-panels-ammonia-los-palos-street; *Particle Pollution Advisory Extended Due to Warehouse Fire*, Cnty. of L.A. Pub. Health (June 21, 2026), http://publichealth.lacounty.gov/phcommon/public/media/mediapubhpdetail.cfm?prid=5356.

[14] Tony Briscoe & Hayley Smith, *Boyle Heights Blaze Choked Parts of LA with Astronomical Soot Pollution*, L.A. Times (July 2, 2026), https://www.latimes.com/environment/story/2026-07-02/boyle-heights-blaze-choked-la-with-astronomical-soot-pollution.

[15] *Id.*

[16] Hayley Smith, *ER Visits Spiked During Toxic Boyle Heights Warehouse Fire*, L.A. Times (June 30, 2026), https://www.latimes.com/environment/story/2026-06-30/hospital-visits-for-smoke-inhalation-spiked-during-boyle-heights-warehouse-fire.

[17] *Id.*

in increased primary care office visits and exacerbations of chronic disease over the weeks following the blaze.[18]

### E. Plaintiffs' Experiences

43. Beginning on or about Wednesday, June 17, 2026, Plaintiff **Vanessa Reyes** received notice of the fire at the Facility and of the initial shelter-in-place order.

44. Plaintiff Reyes resides about three and a half miles from the Facility. Plaintiff Reyes noticed smoke and ash present both inside and outside her residence. Plaintiff Reyes has a compromised immune system and experienced nausea, lightheadedness, and respiratory issues as a result of the smoke.

45. As a result of the shelter-in-place order and the conditions caused by the fire, Plaintiff Reyes has incurred and continues to incur out-of-pocket expenses and other damages, including but not limited to: increased utility costs from running air conditioning and air purifiers to keep air breathable within her residence; potential medical expenses associated with evaluating and treating respiratory symptoms experienced; and loss of the use, enjoyment, and habitability of her residence.

46. Beginning on or about Wednesday, June 17, 2026, Plaintiff **Julio Pombal** received notice of the fire at the Facility and of the initial shelter-in-place order.

47. Plaintiff Pombal resides about one mile from the Facility. Plaintiff Pombal noticed smoke and ash present both inside and outside his residence. Plaintiff Pombal developed respiratory issues, headaches, and nausea due to smoke inhalation. He experienced sleep disruption for days because of the close proximity of his home to the Facility.

48. As a result of the shelter-in-place order and the conditions caused by the fire, Plaintiff Pombal has incurred and continues to incur out-of-pocket expenses and other damages, including but not limited to: increased utility costs from running air conditioning and air purifiers to keep air breathable within his residence; potential medical expenses associated with evaluating and treating respiratory symptoms experienced; and loss of the use, enjoyment, and habitability of his residence.

[18] *Id.*

## V. CLASS ACTION ALLEGATIONS

49. Plaintiffs bring this action on their own behalf and on behalf of a class defined as:

> All persons who reside, were present, or own property in the areas affected by the evacuation order, shelter-in-place orders, and air quality warnings issued as a result of the fire at the Facility that began on June 17, 2026.

50. Excluded from the above Class are Defendants, including any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants. Also excluded are the judges and court personnel in this case and any members of their immediate families.

51. Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

52. This case is properly maintainable as a class action pursuant to and in accordance with Federal Rule of Civil Procedure 23 in that:

a. The Class, which include thousands of members, are so numerous that joinder of all Class Members is impracticable;

b. There are substantial questions of law and fact common to the Class, including those set forth in greater particularity herein;

c. Questions of law and fact, such as those enumerated below, which are common to the Class, predominate over any questions of law or fact affecting only individual members of the Class;

d. The claims of the representative parties are typical of the claims of the Class;

e. A class action is superior to any other type of action for the fair and efficient adjudication of the controversy;

f. The relief sought in this class action will effectively and efficiently provide relief to all members of the Class (collectively, "Class Members");

g. The prosecution of separate lawsuits by members of the Class would risk inconsistent or varying adjudications. Class-wide adjudication of these claims is, therefore, appropriate.

h. There are no unusual difficulties foreseen in the management of this class action; and

i. Plaintiffs, whose claims are typical of those of the Class, through their experienced counsel, will zealously and adequately represent the Class.

53. **Numerosity.** The members of the Class are so numerous that the joinder of all members is impractical. According to public information, approximately 70 people were evacuated from the area surrounding the Facility, 4,000 people in the Boyle Heights community were under shelter-in-place orders, and thousands of other were in areas under air quality warnings. While the exact number of Class Members is unknown to Plaintiffs at this time, Plaintiffs believe that the Class includes thousands of members. The disposition of the claims of Class Members in a single action will provide substantial benefits to all parties and to the Court.

54. **Commonality.** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendants breached their duty to exercise the utmost care and diligence in the ownership, operation, management, supervision, inspection, maintenance, repair, and/or control of their facility and the hazardous chemicals, so as to not cause harm to public property, the environment, public resources, public health, and/or the comfortable use and enjoyment of life and liberty by the public;

b. Whether Defendants acted unfairly and committed unfair business practices by failing to implement reasonable practices concerning the safety of their facility and management of hazardous chemicals;

c. Whether Defendants' negligence created a foreseeable risk of harm to those who work, own property, reside, or otherwise are located around the Facility;

d. Whether Plaintiffs in the Class suffered an injury due to Defendants' negligence and unfair business practices that prompted the evacuation orders;

e. Whether Defendants' breach was the legal and proximate cause of Plaintiffs' damages;

f. Whether Defendants' acts or omissions as set forth herein have interfered with Plaintiffs' property rights, privileges, and use and enjoyment of property so as to constitute a nuisance;

g. Whether Defendants were engaged in an extrahazardous and/or ultrahazardous activity and/or intentionally, recklessly, and/or negligently caused an array of toxic substances, noise, soot, ash, and/or dust to enter Plaintiffs' property;

h. Whether Defendants' activities in operating, controlling, managing, and/or maintaining their facility and the hazardous chemicals located therein constitute an extrahazardous and/or ultrahazardous and abnormally dangerous activity.

55. **Typicality.** Plaintiffs' claims are typical of those of other members of the Class. Specifically, Plaintiffs suffered injury and damages resulting from the shelter-in-place order and the immense smoke and air pollution in the area where he resided or was otherwise located.

56. **Adequacy of Representation.** Plaintiffs will fairly, vigorously and adequately represent and protect the interests of the members of the Class. Plaintiffs have retained competent counsel experienced in litigation of class actions, including actions relating to chemical incidents, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs' claims are typical of the claims of other members of the Class and Plaintiffs have the same non-conflicting interests as the other Members of the Class. The interest of the Class will be fairly and adequately represented by Plaintiffs and their counsel.

57. **Superiority of Class Action.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable, and questions of law and fact common to the class predominate over any questions affecting only individual members of the class. Furthermore, the adjudication of this controversy

through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

58. Damages for any individual class member are likely insufficient to justify the cost of individual litigation so that, in the absence of class treatment, Defendants' violations of law inflicting substantial damages in the aggregate would go un-remedied.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Negligence

59. Plaintiffs reallege and incorporates the factual allegations set forth above.

60. Plaintiffs are informed and believes, and thereon allege, that at the time of the subject incident, Defendants owned, operated, controlled, managed, and/or maintained the real property, industrial facilities, equipment, piping, valves, appurtenances, and chemical storage systems located at the Facility, as described above.

61. At all relevant times, Defendants stored, used, transferred, processed, and/or maintained hazardous chemicals at the Facility, including but not limited to anhydrous ammonia, in one or more refrigerant lines and related systems.

62. The storage, handling, and maintenance of hazardous chemicals in large quantities created a high degree of risk of serious harm if valves, seals, lines, pressure-relief systems, containment systems, monitoring systems, or associated equipment were not properly designed, inspected, maintained, repaired, and operated.

63. At all relevant times, Defendants were required to exercise the utmost care and diligence in the ownership, operation, management, supervision, inspection, maintenance, repair, and/or control of the Facility, including in the prevention of fires, explosions, and/or the uncontrolled release of hazardous substances, so as not to cause harm to public property, the environment, public resources, public health, and/or the comfortable use and enjoyment of life and liberty by the public.

64. That duty included, without limitation, duties to: properly inspect refrigerant lines and associated equipment; timely identify corrosion, degradation, leaks, over-pressurization risks, seal failures, and other dangerous conditions; perform necessary maintenance and repairs; replace defective or worn components; implement adequate leak-detection, secondary-containment, and emergency shutoff systems; safely store hazardous chemicals; train personnel; comply with safety requirements; and warn and protect nearby persons and property from unreasonable risks of harm.

65. Defendants breached their duties by, among other things, negligently owning, operating, inspecting, maintaining, repairing, managing, monitoring, and controlling the Facility, Solar Array, and surrounding premises, so as to prevent fires, explosions, and uncontrolled release of hazardous substances into the air and the environment.

66. Defendants' negligence included, without limitation: (a) failing to adequately inspect the Facility, Solar Array and/or related equipment; (b) failing to timely repair or replace Solar Array components; (c) failing to implement adequate containment, ventilation, monitoring, alarm, and shutdown systems; (d) failing to adopt and enforce adequate policies for hazardous materials storage and leak prevention; (e) failing to properly supervise and train employees, agents, and contractors; (f) storing hazardous chemicals in an unsafe manner and/or in unsafe quantities for the location; (g) failing to warn nearby residents, workers, and the public of the danger; and (h) otherwise failing to maintain and operate the Facility and/or Solar Array in a reasonably safe condition.

67. Defendants also breached their duty of reasonable care by, among other things, storing and maintaining large quantities of hazardous chemical substances at the Facility in a densely populated area, despite the foreseeable risk that any leak, release, fire, or explosion would endanger nearby residents, businesses, and the surrounding community.

68. Defendants' conduct fell below the standard of care required of a reasonably careful person or entity in similar circumstances.

69. Defendants further failed to comply with applicable federal, state, and local statutes, regulations, ordinances, permits, safety requirements, industry standards, and internal safety protocols

governing hazardous materials storage, tank integrity, leak prevention, inspection, maintenance, emergency planning, release reporting, and protection of the surrounding community.

70. Pursuant to California Evidence Code section 669 and applicable law, Defendants' violation of such enactments gives rise to a presumption of negligence, except to the extent Defendants can establish a valid excuse.

71. As a direct and proximate result of Defendants' breach of their duties, Plaintiffs and those similarly situated were harmed. Defendants' breach of their duties was the direct and proximate cause of the fire at the Facility, which reached a refrigerant line carrying anhydrous ammonia and caused the release of hazardous substances and the interference with property rights of Plaintiffs.

72. As further direct and legal result of Defendants' breach of their duties, Plaintiffs have suffered damages, including but not limited to, economic loss from evacuation-related expenses, lost wages, disruption and inconvenience, exposure to hazardous conditions, and interference with property rights.

73. Plaintiffs did not consent to Defendants' conduct, which has required Plaintiffs to shelter-in-place in order to avoid immediate harm. Defendants' conduct has also created long-lasting and continuing harm.

74. The harms suffered by Plaintiffs were a direct, natural, and foreseeable consequence of Defendants' conduct. Defendants knew or should have known that the failure to properly inspect, maintain, repair, and monitor the Solar Array and the Facility's equipment used to store and handle hazardous chemicals created a substantial risk of leaks, releases, fires, or explosions. Defendants further knew or should have known that storing large quantities of such hazardous substances in a densely populated area would magnify the consequences of any such failure, making widespread harm—including evacuation, displacement, property damage, and economic loss to nearby residents and businesses—not only possible but likely.

75. Defendants knew or should have known of the dangerous condition of the Solar Array and Facility equipment, including because of one or more of the following: prior fires, inadequate maintenance, deferred repairs, alarm failures, inspection deficiencies, equipment age, improper storage

conditions, inadequate secondary containment, inadequate monitoring, and the well-known hazardous properties of the chemicals being stored.

76. In light of these circumstances, the risk of a significant incident affecting the surrounding community was plainly foreseeable, and the injuries alleged herein were the foreseeable result of Defendants' acts and omissions.

**SECOND CAUSE OF ACTION**

**Premises Liability**

77. Plaintiffs reallege and incorporate the factual allegations set forth above.

78. At all relevant times, Defendants owned, leased, occupied, operated, maintained, managed, and/or controlled the Facility, including the hazardous chemical tank system and related equipment.

79. Defendants owed Plaintiffs and the Class a duty to use reasonable care in the ownership, operation, inspection, maintenance, repair, and control of the Facility and Solar Array and to avoid exposing persons and property to an unreasonable risk of harm.

80. The Facility and/or Solar Array were in dangerous condition in that one or more components or systems were improperly maintained, inadequately inspected, defectively repaired, insufficiently monitored, and/or otherwise unsafe, resulting in the release or threatened release of hazardous chemicals.

81. This condition created a substantial and unreasonable risk of toxic exposure, contamination, fire, explosion, evacuation, displacement, and other serious harm to persons and property in the vicinity.

82. Defendants knew or, in the exercise of reasonable care, should have known of the dangerous condition of the Facility and/or Solar Array, including because reasonable inspection, maintenance, and monitoring would have revealed the risk of fire, explosion, and/or release of hazardous chemicals.

83. Defendants had sufficient time to discover the dangerous condition and to repair, remedy, contain, guard against, warn of, or otherwise prevent the harm.

84. Defendants negligently failed to inspect, maintain, repair, replace, monitor, contain, warn of, and otherwise correct the dangerous condition.

85. Defendants further failed to comply with applicable safety requirements governing hazardous chemical storage, which further rendered the Facility unsafe.

86. The failure to properly maintain hazardous chemicals at the Facility, especially in or near a populated area, created a foreseeable risk of the type of harm suffered by Plaintiffs and the Class.

87. Defendants' negligence was a substantial factor in causing Plaintiffs' and the Class's injuries and damages.

88. As a direct and legal result of Defendants' conduct, Plaintiffs and the Class suffered damages according to proof.

## THIRD CAUSE OF ACTION

## Private Nuisance, California Civil Code § 3479

89. Plaintiffs reallege and incorporate the factual allegation set forth above.

90. At all relevant times, Plaintiffs owned, leased, occupied, possessed, and/or had the right to use and enjoy real property ("Property") located within the State of California.

91. Defendants' acts or omissions as set forth herein have interfered with Plaintiffs' property rights, privileges, and use and enjoyment of property so as to constitute a nuisance.

92. Plaintiffs' interests in the use and enjoyment of their property was diminished by Defendants' acts or omissions, which caused, among other things: inability to access, occupy, or use outdoor spaces on Plaintiffs' Property; the release of hazardous and other substances into the air and onto Plaintiffs' Property; and exposure to noxious odors, fumes, and/or safety risks.

93. The interference was of such a nature, duration, and severity that it would annoy, disturb, and/or injure an ordinary reasonable person.

94. Plaintiffs did not consent to Defendants' actions as described herein.

95. Defendants' acts and omissions as alleged herein constitute an unreasonable interference with the safety, peace, comfort, and convenience of the Plaintiffs and all others similarly situated.

96. Defendants' conduct in creating and/or permitting this condition was intentional and unreasonable, or, alternatively, negligent, reckless, and/or the result of abnormally dangerous activities.

97. The condition created and maintained by Defendants was: injurious to health; offensive and harmful to the senses; and an obstruction to the free use of property that interfered with the comfortable enjoyment of life and property.

98. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and continue to suffer harm, including but not limited to: loss of use and enjoyment of their Property; annoyance, discomfort, inconvenience, and disruption; and other economic and non-economic damages according to proof.

99. Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

100. The seriousness of the harm suffered by Plaintiffs outweighs any social utility of Defendants' conduct.

101. Defendants were aware of the risks associated with their equipment, including the likelihood of failure without proper inspection, maintenance, and repair, and knew that such failure could result in the release of hazardous substances. Despite this knowledge, Defendants consciously failed to take reasonable corrective action, including failing to repair or replace defective components and failing to implement appropriate monitoring and safety systems, in conscious disregard of the foreseeable harm to Plaintiffs.

102. Defendants further acted with conscious disregard by maintaining large quantities of hazardous chemicals at a facility located in a densely populated area, where Defendants knew that any release would likely result in widespread harm, including mass evacuations, displacement, property damage, and exposure to toxic substances. The magnitude of the risk, coupled with Defendants' failure to take reasonable steps to eliminate or reduce that risk, renders Defendants' conduct despicable and warrants the imposition of punitive damages.

103. On information and belief, Defendants prioritized cost savings and operational efficiency over safety by deferring maintenance and declining to implement available safety measures that would have reduced the risk of a chemical release. This conscious decision to place profits above the safety of the surrounding community constitutes despicable conduct carried out in willful and conscious disregard of the rights and safety of others.

104. The foregoing conduct was authorized, ratified, and/or carried out by Defendants' officers, directors, or managing agents within the meaning of California Civil Code Section 3294(b).

## FOURTH CAUSE OF ACTION

### Public Nuisance, California Civil Code § 3480

105. Plaintiffs incorporate the factual allegations set forth above.

106. Defendants created, caused, and/or permitted a condition to exist consisting of the release, threatened release, storage, handling, and/or instability of hazardous chemicals and substances that was: injurious to health; offensive to the senses; and/or an obstruction to the free use of property.

107. The condition described above affected a substantial number of people at the same time, including residents, occupants, and members of the surrounding community and neighborhood.

108. The condition interfered with public rights, including but not limited to: the safe use and enjoyment of homes and residential property; the use of public streets, infrastructure, and community resources; and the public's right to health, safety, and comfort.

109. The condition was of such a nature that an ordinary reasonable person would be annoyed, disturbed, and/or alarmed by its existence.

110. The seriousness of the harm to the public outweighs any social utility of Defendants' conduct.

111. Plaintiffs have suffered harm that is different in kind, and not merely in degree, from that suffered by the general public, including but not limited to: interference with Plaintiffs' specific property; individualized loss of use and enjoyment of their Property; and particularized economic and non-economic damages.

112. Defendants' conduct was a substantial factor in causing Plaintiffs' injuries.

113. Defendants' conduct was carried out with malice and oppression within the meaning of California Civil Code section 3294, in that Defendants acted with conscious disregard of the rights and safety of Plaintiffs and the surrounding community.

114. The foregoing conduct was authorized, ratified, and/or carried out by Defendants' officers, directors, or managing agents within the meaning of section 3294(b).

**FIFTH CAUSE OF ACTION**

**Trespass**

115. Plaintiffs incorporate the factual allegations set forth above.

116. Defendants were engaged in an extrahazardous and/or ultrahazardous activity and intentionally, recklessly, or negligently caused a physical invasion onto Plaintiffs' properties, including but not limited to hazardous chemicals; toxic fumes, vapors, or particulate matter; and/or other physical substances.

117. Plaintiffs did not give permission for this direct or indirect entry.

118. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered harm, including: physical invasion of property; loss of use and enjoyment; property damage and/or contamination; and related economic and non-economic damages.

119. An ordinary person of reasonable sensibility would reasonably be annoyed and/or disturbed by the conditions created by Defendants.

120. Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

121. Defendants' conduct was carried out with malice and oppression within the meaning of California Civil Code section 3294, in that Defendants acted with conscious disregard of the rights and safety of Plaintiffs and the surrounding community.

122. The foregoing conduct was authorized, ratified, and/or carried out by Defendants' officers, directors, or managing agents within the meaning of section 3294(b).

**SIXTH CAUSE OF ACTION**

**Strict Liability–Extrahazardous and/or Ultrahazardous Activity**

123. Plaintiffs incorporate the factual allegations set forth above.

124. At all times relevant herein, Defendants' activities in operating, controlling, managing, and/or maintaining the Facility, including the Solar Array and refrigerant line(s), constitute an extrahazardous and/or ultrahazardous and abnormally dangerous activity in that they: involve a high degree of risk of harm to persons and property; create a likelihood that the harm resulting would be great; present risks that cannot be eliminated through the exercise of reasonable care; are not matters of common usage; are inappropriate to the location where they were conducted (including proximity to residential communities); and have risks that outweigh any utility to the community.

125. As alleged herein, Plaintiffs were seriously harmed, as a direct result of Defendants' extrahazardous and/or ultrahazardous and abnormally dangers activities in operating and maintaining the Facility and Solar Array.

126. Plaintiffs' harm, as outlined above, was the kind of harm that would be anticipated as a result of the risk created by Defendants' extrahazardous and/or ultrahazardous and abnormally dangerous activities, specifically the operation and maintenance of a facility with anhydrous ammonia.

127. Defendants' extrahazardous and/or ultrahazardous and abnormally dangerous activities resulted in a leak that emitted toxins into that air and was the direct cause of the evacuation that deprived Plaintiffs of the enjoyment and use of their homes.

128. The harm caused by Defendants' activities is continuing and/or recurring in nature, and unless abated is likely to continue to cause injury to Plaintiffs.

129. Defendants are strictly liable for Plaintiffs' injuries regardless of the level of care exercised.

130. As a direct and legal cause of the wrongful acts herein set forth, Plaintiffs suffered damages as described above in the preceding paragraphs.

**SEVENTH CAUSE OF ACTION**

**Unlawful Business Practice, Cal. Bus. & Prof. Code § 17200 et seq.**

131. Plaintiffs incorporate the factual allegations set forth above.

132. California's Unfair Competition Law ("UCL"), Business and Professions Code sections 17200 et seq., prohibits any "unlawful, unfair or fraudulent business act or practice."

133. Defendants have engaged in unlawful and/or unfair business acts and practices within the meaning of the UCL by, among other things, owning, operating, maintaining, managing, and/or controlling the Facility and Solar Array in a manner that caused or contributed to the release, leak, emission, discharge, and/or threatened release of hazardous chemical substances, resulting in evacuation orders, shelter-in-place orders, road closures, business interruptions, and other harms to Plaintiffs and members of the Class.

134. Defendants' conduct constitutes "unlawful" business acts or practices under Business and Professions Code section 17200 because it violated, and continues to violate, underlying constitutional, statutory, regulatory, and/or common-law duties, including but not limited to duties imposed by California environmental, hazardous-materials, public-safety, and nuisance laws.

135. Defendants' unlawful conduct includes, without limitation: (a) failing to safely store, contain, inspect, maintain, monitor, and/or operate hazardous chemicals and related equipment; (b) failing to implement reasonable safety systems, mitigation measures, emergency protocols, and/or release-prevention measures; (c) failing to exercise due care in the handling and management of hazardous substances at the Facility; (d) creating, maintaining, and/or permitting conditions that endangered the public and surrounding community and interfered with the comfortable enjoyment of life or property; (e) violating applicable provisions of the California Health and Safety Code, California Code of Regulations, local fire and safety codes, and other laws governing hazardous materials, industrial safety, emergency preparedness, reporting, containment, and release prevention; and (f) engaging in conduct constituting public and/or private nuisance under California law.

136. Each of the foregoing violations constitutes an independently actionable predicate violation that may be borrowed and redressed through the UCL.

137. Defendants' acts and practices were also "unfair" within the meaning of the UCL.

138. Defendants' conduct offended established public policies embodied in California's environmental protection, hazardous-materials management, workplace and community safety, and nuisance laws.

139. Defendants' conduct was immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiffs and the public because Defendants exposed nearby residents, workers, and businesses to an unreasonable risk of chemical release, fire, explosion, toxic exposure, evacuation, displacement, and property-related losses.

140. The gravity of the harm to Plaintiffs and the public far outweighs any utility associated with Defendants' cost-cutting, inadequate maintenance, insufficient safety measures, failure to upgrade aging equipment, and/or other acts or omissions that caused or contributed to the incident.

141. Defendants' conduct also caused substantial injury to consumers and members of the public that they could not reasonably have avoided and that was not outweighed by any countervailing benefits to consumers or competition.

142. As a direct and proximate result of Defendants' unfair competition, Plaintiffs suffered injury in fact and lost money or property within the meaning of California Business and Professions Code Section 17204.

143. Plaintiffs' economic injuries include, without limitation, out-of-pocket expenses for medical evaluation and treatment; cleanup, and replacement of contaminated or inaccessible property; the cost of purchasing multiple air purifiers; increased utility costs from running air conditioning and air purifiers to keep air breathable within Plaintiffs' residence; lost wages and income; and diminution in the value, use, and/or enjoyment of their real and personal property.

144. These injuries were caused by Defendants' unlawful and/or unfair acts and practices as alleged herein.

145. Defendants' misconduct is ongoing or there is a real and immediate threat that it will recur unless enjoined by this Court. Plaintiffs and Class members lack an adequate remedy at law with respect to the requested forward-looking relief because money damages alone will not ensure that Defendants cease their unlawful and unfair practices, eliminate hazardous conditions, implement

appropriate safety reforms, and protect the surrounding community from future releases and evacuations.

146. Pursuant to Business and Professions Code Sections 17203 and 17204, Plaintiffs seek orders restoring to Plaintiffs and the Class money or property acquired or retained by Defendants by means of their unfair competition, to the extent permitted by law.

147. Plaintiffs further seek public injunctive relief and such other equitable relief as the Court deems proper, including but not limited to orders requiring Defendants to identify and abate hazardous conditions, implement adequate inspection and maintenance protocols, improve containment and emergency shutdown systems, provide appropriate community warning and response measures, and comply with all applicable hazardous-materials and public-safety requirements.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all Class Members proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

a. For an Order certifying the Class, and appointing Plaintiffs and their Counsel to represent the Class;

b. Awarding Plaintiffs actual damages, including remediation damages, loss of use damages, diminution in value damages, nuisance damages, and any other compensatory and consequential damages, in an amount to be determined at trial;

c. Awarding Plaintiffs general damages for fear, worry, annoyance, disturbance, inconvenience, mental anguish, emotional distress, loss of quiet enjoyment of property, personal injury, and for such other and further relief as the Court shall deem proper, all according to proof;

d. Awarding Plaintiffs punitive damages;

e. Awarding Plaintiffs pre-judgment and post-judgment interest;

f. Awarding Plaintiffs such costs and disbursements as are incurred in prosecuting this action, including reasonable attorneys' fees, as allowable by law; and

g. Granting Plaintiffs such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial for all claims so triable.

**ZIMMERMAN REED LLP**

Date: August 3, 2026 By: /s/ Caleb Marker

Caleb Marker
caleb.marker@zimmreed.com
Nare Kupelian
nare.kupelian@zimmreed.com
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048

Molly Billion
molly.billion@zimmreed.com
80 S 8th Street, 1100 IDS Center
Minneapolis, MN 55402

*Attorneys for Plaintiffs*